Donald Ringer v. State of Nebraska.

Filed March 3, 1926.    No. 24865.

1. **Criminal Law: Preliminary Examination: Waiver.** When
one charged with committing a crime, on being brought before
an examining magistrate, voluntarily pleads guilty to the crime
charged, he thereby waives his right to a preliminary examina-
tion.

2. **Homicide: Information.** "An information charging murder in
the first degree in language bringing it within the rule announced
in *Nichols v. State,* 109 Neb. 335, is sufficient." *Phegley v.
State,* 113 Neb. 138.

3. ———: **Laws Continued in Force.** "Defendant's contention
that no crime of murder existed in this state at the time the
crime charged was committed is not well taken in view of section

Ringer v. State.

1, art. XVII of the present Constitution, which provides: "All laws then in force, not inconsistent with the Constitution as amended by such proposals as may be adopted at such election, shall continue in force until amended or repealed.'" *Phegley v. State*, 113 Neb. 138.

4. **Criminal Law:** CONTINUANCE. "The granting or refusing of a continuance of a criminal cause rests in the sound discretion of the court, and a ruling in that regard will not be disturbed on review, in the absence of a showing of an abuse of discretion." *Dinsmore v. State*, 61 Neb. 418.

5. ————: CHANGE OF VENUE. "A motion for a change of venue in a criminal case is addressed to the sound discretion of the trial court, and its ruling thereon will not be disturbed unless an abuse of such discretion is disclosed." *Simmons v. State*, 111 Neb. 644.

6. **Jury:** SUMMONING ADDITIONAL JURORS. Under the provisions of section 9078, Comp. St. 1922, in force at the time of the trial, it was competent for the trial court to direct the sheriff to summon good and lawful men, having the qualifications of jurors, to fill the regular panel, which had become depleted by excusing two members for good cause.

7. ————: QUALIFICATION. When a juror on his *voir dire* examination states that he has formed an opinion of the guilt or innocence of the accused, founded upon reading newspaper statements, and not upon conversation with witnesses, and at the same time states that he feels able, notwithstanding such opinion, to render an impartial verdict upon the law and the evidence, and the court is satisfied that the juror is impartial and will render such verdict, he may, in the discretion of the court, be permitted to serve.

8. **Criminal Law:** CONFESSIONS. A statement freely and voluntarily made by defendant, not induced by threats, or promises, wherein he admits the commission of the crime for which he is being tried, is competent to be received in evidence.

9. ————: ————. Where the trial court, on a proper foundation being laid, admits proof of a confession made by the accused, which is subsequently challenged by the defendant as involuntary, upon the issue thus presented, the court should direct the jury to disregard the confession if, upon a consideration of all of the evidence, they find it was not voluntarily made.

10. **Evidence** examined, and *held* sufficient to support the verdict and judgment.

ERROR to the district court for Adams county: WILLIAM A. DILSWORTH, JUDGE. *Affirmed.*

*J. E. Willits,* for plaintiff in error.

*O. S. Spillman, Attorney General,* and *Lloyd Dort, contra.*

Heard before MORRISSEY, C. J., ROSE, DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ.

DAY, J.

Donald Ringer, hereinafter referred to as defendant, was convicted of murder in the first degree for killing one Carl W. Moore on October 16, 1924, and, in response to the verdict fixing the penalty, was sentenced to suffer death. Alleging that there was prejudicial error upon the trial, the defendant has brought the record of his conviction to this court for review. It is first urged that the court erred in overruling the defendant's plea in abatement. It appears that, when the defendant was about to be arraigned, his counsel in open court stated that he desired to present a plea in abatement, but would waive a jury trial on such plea.

Very much abbreviated, the plea in abatement alleged, in substance, (1) that the defendant never had a preliminary examination as provided by law; that no witnesses were examined by the magistrate and the binding of the defendant over to the district court was void and of no effect; (2) that the information does not allege facts sufficient to charge any degree of murder or manslaughter; (3) that there is no law in effect in the state of Nebraska defining murder or manslaughter; and (4) that the defendant was brought into the state of Nebraska from the state of Mississippi and other states, unlawfully and by force of arms, and by reason thereof the court has no jurisdiction over the person of the defendant.

In respect to the first point raised by the plea in abatement, to the effect that no preliminary examination was had, we think the record fails to sustain the defendant's contention. When the defendant was brought before the magistrate and arraigned, he entered a plea of guilty to the complaint, and, without the examination of witnesses,

was bound over to the district court. It is argued by the defendant's counsel that the magistrate had no power to bind the defendant over to the district court except upon the sworn testimony of witnesses. This position is untenable. The right of a preliminary examination is one which may be waived by the accused. *Clawson v. State,* 96 Neb. 499; *Reinoehl v. State,* 62 Neb. 619. The precise question now before the court was considered in *Latimer v. State,* 55 Neb. 609, where it was held:

"If the accused, on being arrested and brought before an examining magistrate, voluntarily pleads that he is guilty of the crime charged against him, he thereby waives his right to a preliminary examination."

It is urged, however, that, in entering the plea of guilty to the complaint, the defendant acted without advice of counsel or friends and under the dominating influence of the officers who had him in charge. It is true that the defendant did not have counsel, and that his friends had not been notified that he had been returned to the state of Nebraska. The record shows, however, that when he was brought before the examining magistrate he was told that he was entitled to have counsel to represent him, that he was entitled to have a continuance if he desired, and that it was not necessary for him to plead. After being so advised, the defendant stated that he was ready to plead, and upon being arraigned to the complaint he pleaded guilty. The showing made by the defendant in support of his claim that he was dominated by the officers in entering the plea is far from convincing.

The preliminary hearing was on January 7, 1925, the day defendant was returned to Adams county. On the following day a motion was made to expunge the record and grant defendant a further preliminary hearing. This was denied by the magistrate. Under the showing, there was no error in refusing to open up the case for further testimony. It may well be doubted whether the magistrate had any power to withdraw his order made on the previous day.

The second proposition in the plea of abatement is that

the facts alleged in the information are not sufficient to charge any degree of murder or manslaughter. The form of the information in the present case was, no doubt, drawn in response to a suggestion of this court in *Nichols v. State,* 109 Neb. 335, in which it was stated that the long and complicated form of an information for murder, generally in use, is not necessary to meet the requirements of the statute, and a short form set out in the opinion was suggested. The question now raised was before the court in *Phegley v. State,* 113 Neb. 138, in which it was held: "An information charging murder in the first degree in language bringing it within the rule announced in *Nichols v. State,* 109 Neb. 335, is sufficient." Measured by these standards, the information charged the offense of murder in the first degree.

The third contention raised by the plea in abatement to the effect that no crime of murder or manslaughter existed in the state at the time the alleged crime was committed, is entirely without merit. This point was also raised in the *Phegley* case, *supra,* wherein it was held:

"Defendant's contention that no crime of murder existed in this state at the time the crime charged was committed is not well taken in view of section 1, art. XVII of the present Constitution, which provides: 'All laws then in force, not inconsistent with the Constitution as amended by such proposals as may be adopted at such election, shall continue in force until amended or repealed.'"

The fourth proposition urged in support of the plea in abatement is that the defendant was unlawfully and by force of arms removed from the state of Mississippi and other states and brought to the state of Nebraska. The evidence in support of this phase of the plea was the affidavit of the defendant. The affidavit, however, does not show that he was taken out of the states mentioned without his consent or against his will, nor does it set out any facts from which such an inference may fairly be drawn. The presumption is that the officers acted lawfully and within their authority. In this connection it may be

stated that at a later period during the trial a writing was introduced in evidence, signed by the defendant, in which he waived extradition from the state of Mississippi to the state of Nebraska.   Considering the record made in support of the plea in abatement and the proposition of law presented, we are quite satisfied there was no error in overruling the plea in abatement.

It is next urged that the court erred in overruling the defendant's demurrer to the information.   The questions raised by the demurrer have been considered in the points in the plea in abatement and further discussion seems unnecessary.   Upon the authority of the *Phegley* case, *supra,* the demurrer was properly overruled.

It is next contended that the court erred in overruling the defendant's motion for a continuance.   The motion recited that a continuance was desired in order to enable defendant to secure the testimony of certain witnesses who would testify that, while the defendant was in the the different places named, he made no effort to conceal himself. With respect to these witnesses no showing of diligence was made.   The motion also recited that the defendant desired the testimony of George Bender, who would testify that the defendant was not with Carl W. Moore on the date of the homicide.   Bender was charged in the information as co-defendant.   Counsel for defense admitted that he did not know his whereabouts.   Bender was a fugitive from justice.   There was no showing of any probability that his evidence could be obtained.   In *Dinsmore v. State,* 61 Neb. 418, it was held:   "The granting or refusing of a continuance of a criminal cause rests in the sound discretion of the court, and a ruling in that regard will not be disturbed on review, in the absence of a showing of an abuse of discretion."   There was no error in overruling the motion for continuance.

Defendant also complains of the overruling of his motion for a change of venue.   The only showing made in support of the motion was the verification of the motion by the defendant.   There was no error in the ruling on the motion.

"A motion for a change of venue in a criminal case is addressed to the sound discretion of the trial court, and its ruling thereon will not be disturbed unless an abuse of such discretion is disclosed." *Simmons v. State,* 111 Neb. 644.

Defendant also urges that the court erred in overruling his motion to quash the jury panel. The point sought to be made is that, of the 24 names of jurors selected from a list of 60 names submitted by the board of supervisors, 22 only were on the regular panel. The record shows that in the manner provided by law, 24 names of jurors were regularly selected and summoned for jury service. On reporting to the court, two of the men selected were excused for good cause and their places filled by the sheriff, by order of the court. This order of the court was authorized by section 9078, Comp. St. 1922, which was then in force.

The defendant also contends that the court erred in overruling his challenge for cause made against four jurors during the course of their examination. It would unduly prolong this opinion to set out in detail the examination of the several jurors. Generally speaking, they all stated that they had read newspaper articles concerning the case, had talked about the case, and formed opinions, which they still held. Upon examination by counsel for the state and the court, they stated that, notwithstanding such opinion, they could lay their views aside and pay no attention to what they had heard or read, in their consideration of the case, and would do so if they were retained as jurors, and would be guided solely by the evidence and the instructions of the court. Section 10134, Comp. St. 1922, in so far as applicable to the present situation, provides, in substance: When a juror on his *voir dire* examination states that he has formed an opinion of the guilt or innocence of the accused, founded upon reading newspaper statements, and not upon conversation with witnesses, and at the same time states that he feels able, notwithstanding such opinion, to render an impartial verdict upon the law and the evidence, and the court is satisfied that the juror is impartial and will render such verdict, he may, in the discretion of the court, be per-

mitted to serve. In *Whitcomb v. State,* 102 Neb. 236, the *voir dire* examination of the jurors disclosed a situation strikingly similar to that in the case before us. In that case, in the course of the opinion, it was said:

"These jurors answered that they had formed opinions as to the guilt or innocence of the defendant, and some of them answered that their opinions were such as it would take evidence to remove. These opinions had been formed from what they had heard or read in the newspapers, but not from conversation with any person who had witnessed or claimed to have witnessed the crime, or from a record of the testimony of such persons. None said he had a fixed, conclusive opinion upon the facts, or prejudice of any kind. They all answered that they could lay aside the opinions which they had formed and try the case fairly and impartially upon the evidence and the law as presented."

See *Pumphrey v. State,* 84 Neb. 636, and *Christiancy v. State,* 106 Neb. 822. We think these jurors were qualified to hear the case.

We now come to consider the assignment of error relating to the sufficiency of the evidence to support the verdict and judgment, and also the assignment that incompetent testimony was permitted to be introduced, to the great prejudice of the defendant. It appears that the defendant, a young man of about 18 years of age, and a companion, George Bender, of about 23 years of age, came to Hastings, in Adams county, Nebraska, about August 5, 1924, and remained there until October 16, 1924. During their stay at Hastings they made their home with the defendant's mother and worked at different places. They purchased a second-hand Chevrolet car for $25 which they used. Defendant had formerly lived in Adams county, but for several years prior to his return in August had made his home with a married sister at Belleville, Illinois. The testimony on behalf of the state tends to show that on the afternoon of October 15, 1924, the defendant and Bender went to the Brandes Company garage in the city of Hastings, and seemed interested in a Dodge touring car which was left

at the garage for sale. The car was a 1924 model and comparatively new. Carl W. Moore was a salesman at this garage and waited upon the two men. After talking a while and examining the car, Moore took the two men out for a drive and returned with them about 30 minutes later. The defendant was identified as being one of the parties. On the following morning, October 16, 1924, the defendant again came to the garage about 8 o'clock in the morning and left with Moore in the Dodge car. The defendant was identified by two salesmen employed at the garage and by another employee as the person who left in the car with Moore on the morning of October 16. The proprietor of the garage, Mr. Brandes, testified that he saw Moore at the filling station shortly after 8 o'clock on October 16, 1924, that he talked with him, and identified defendant as being in the car at that time. A salesman at the oil filling station testified that he had sold Moore five gallons of gas on the morning of October 16; that there was some one with him whom the witness did not know. Another witness testified that he saw a Dodge touring car about 2½ miles south of Juniata, in the same direction from Hastings where Moore's body was found. Two men were in the car, one of whom he recognized as a salesman at Brandes' garage, although he did not know his name. Another witness, living about 7 miles west of Hastings, saw a Dodge touring car pass, going south; two men were in the car. Three-quarters of an hour later he saw a Dodge car going north on the same road with one man in the car. This place was about 4½ miles north of where the body of Moore was found. On the same day, between 1 and 2 o'clock in the afternoon, the car in question was parked on the streets of Wilber, the driver, upon alighting, going towards the station. The car remained where it had been parked and was later identified as the Dodge touring car in question. On November 1, 1924, the dead body of Carl W. Moore was found in a plum thicket a short distance from an unfrequented highway, and about 9 miles distant from Hastings, in Adams county. The autopsy revealed a fracture of the skull over the frontal

eminence. The doctor who performed the autopsy gave it as his opinion that the injury would cause death, and that it was produced by a blunt instrument. On searching the locality where the body was found, a hammer was discovered, the head and handle being separated.

On December 1, 1924, about 2½ miles from Lyman, Mississippi, the defendant was apprehended. W. W. Branagan, chief of police of Hastings, Nebraska, was present at the time defendant was taken into custody. He testified that defendant was told that he did not have to return to Nebraska without requisition papers if he did not want to; that he had a legal right to demand requisition and to have a lawyer; that the defendant stated that he did not want a lawyer and was willing to return, and that he would sign a waiver of requisition, and thereupon did sign such a waiver, which was identified and offered in evidence. The defendant was then taken to Gulfport, Mississippi, and from there to Eastland, Texas, where he was confined in jail from December 3, 1924, to January 4 or 5, 1925. The reason for this delay being that the officers were searching for Bender. On the trip north, the first stop was at St. Joseph, Missouri. While in jail at St. Joseph defendant made a confession, which was afterwards reduced to writing and signed by him. Before the statement was offered, Branagan testified that he was present at the time the confession was made and the statement signed; that they were freely and voluntarily made and without threats or inducements. We think a sufficient foundation was laid for the introduction of the statement. At this time the defendant had not testified. In substance, the confession stated that George Bender was the first to suggest getting a new car. He suggested that they go to the garage and act as if they wanted to buy a new car, take the salesman out and get the car. These plans were made about a week before October 16. They both went down to the garage October 15 and had the salesman take them out riding. The next day they both went to the garage, but Bender remained outside and did not get in the car. Defendant and Moore left

the garage in a Dodge touring car about 9 o'clock in the morning and drove out in the country about 9 miles. . Defendant was driving the car. He and Bender had picked out the place two days before, thinking it would be an ideal spot to hide the body. Defendant stopped the car and hit Moore with his fist and then hit him with a small mechanic's hammer. Moore became unconscious and fell out of the car. Defendant concealed Moore's body in some bushes and drove the car back to Hastings, and then to Wilber, where he left it, went to the station and bought a ticket to Lincoln. When they left the garage they stopped to get some oil. As an inducement to take him, he told Moore that George wanted to buy the car, that he lived out there and that defendant was his neighbor. He also stated that Bender had taken the hammer from the house and given it to defendant.

John Harr, sheriff of Clay county, testified that he met Branagan and defendant on the train at Carleton, Nebraska; that he had previously known Donald Ringer and sat down and had a conversation with him; that no threats or inducements were held out to the defendant and the statements made by him were free and voluntary; that the defendant was handcuffed. Mr. Crow, county attorney, was present, and stated to Ringer that anything he said might be used as evidence against him. The witness testified in substance that the defendant stated that on the morning of October 16, 1924, he and Bender went to the garage; that later he looked around and could not find Bender, and thought he had gone out; that defendant went with Carl Moore by himself; that he was driving the car; that he hit Moore with his fist first, and then took the hammer out of his pocket and hit him once on the head with it, and that the head of the hammer came off the handle; that he put Moore in the bushes; that they had picked out the spot two days before; that he backed his car, turned around and came back to Hastings; that he went up the alley to see if Bender's car was there, and, not finding it, he drove the car to Wilber, where he left it; that he bought a ticket from Wilber to Lincoln, and caught one train after another and did not

stop any place.  Defendant also stated that he expected to plead guilty.

George Harm, sheriff of Adams county, after laying a sufficient foundation, testified concerning the conversation had with the defendant on January 7, 1925, in the court-house, as follows:  "Q. Now, will you please tell what statements or admissions he made at that time and place in connection with the murder of Carl Moore?  A.Well, I was searching him, and said to him, 'Did you know Carl Moore?' He said, 'No, sir.'  I said, 'Did you kill him?'  He said, 'Yes, sir.'  I said, 'Tell me how it happened, Donald.'  He said, 'Do you want me to tell you just like I told those other fellows?'  I said, 'Tell just how it happened.'  'Well,' he says, 'George Bender planned it, and we wanted an automobile to go to Texas.  We had talked about stealing one, and we decided we would get a salesman out; and he said that I was to go in and get in the car with the salesman at the Brandes garage, and when we backed out he, George Bender, was to get in the car.  We went to the garage and I left Bender outside.  I got in the car with the salesman,' and he said he didn't know who the man was, 'and we backed out of the garage and Bender wasn't there.'  He said, 'We drove down there to that place,' and he says, 'I did not know what to do, so,' he said, 'as we drove down the hill I reached down and pulled the clutch, and as I pulled it back I reached over and hit him with my left hand.'  And he said that, 'Carl fell out over the car this way (indicating),' and he said, 'I got out around the car, and took the hammer and hit him, and he fell out of the car, and I picked his body up and carried it over and put it in this brush.'  I said, 'Did you do this alone, Donald?'  And he says, 'Yes; I did.'  And he says, 'I am willing to take what is coming to me, I realize I made a mistake.'  I says, 'How did you come back to town?'  He says, 'I came the same road that I went out, and drove up in the alley by Fourth street, and I saw that George's car was not there.'  And he says, 'I drove down Fourth street past the courthouse out on the D. L. D.'  I says, 'How did you come to Wilber?'  He says,

'I don't know the name of the town, but they were grading the road, and I detoured and left the car at Wilber, and bought a ticket to Lincoln and went to St. Joe.' " The witness then stated, "I think that is as near verbatim as I can tell you as he told it to me."

Guy Cole, deputy sheriff, was present at the conversation between the sheriff and the defendant, above referred to, and corroborated the main facts as detailed by the sheriff.

The county judge of Adams county, who was the magistrate before whom the complaint was filed, identified the record made by him, which disclosed that, when defendant was arraigned on the complaint charging defendant with murder, he pleaded guilty; that before he pleaded to the arraignment he was told that he was entitled to a continuance if he wanted one; that he did not have to plead if he did not want to; and that he was entitled to have counsel if he so desired.

In addition to this, three witnesses were called in rebuttal, Harvey Moore, and his wife, and a jail companion of the defendant, each of whom testified that, in conversation had with the defendant while in jail at Hastings awaiting trial, he freely admitted having killed Carl W. Moore.

Defendant was a witness on his own behalf. He denied that he had ever been to the Brandes garage, or that he ever took a ride with any automobile salesman from that garage on October 15 or October 16, 1924, or at any other time; denied that he ever struck Carl W. Moore, or any other person, or that he killed him. In fact, he denied every detail which in any manner tended to connect him with the crime. He further testified that on the morning of October 16, about 8:15 o'clock, he and George Bender took their grips and left them at the Burlington station, and both returned to his mother's house; that they left again about 9 o'clock. In this respect defendant was corroborated by his mother and sister. Defendant also testified that he left Hastings on a Burlington train for Lincoln on October 16 between 10 and 11 o'clock. Defendant's mother testified that she was at the station and saw defendant leave

on the train.   Defendant further testified that Branagan and he left Eastland, Texas, about 11:30 o'clock, on the morning of January 4, 1925, and arrived at St. Joseph about noon on the following day; that they rode in a smoking car; that *en route* Branagan asked him if he knew Carl Moore, and he answered, "No."   Branagan then asked him if he ever drove a Dodge car, and he replied, "No."   And he further stated, "I am not on the witness-stand, and don't care to answer your questions here."   Nothing more was said on the subject on the way up.   With respect to the confession made at St. Joseph, defendant testified that, on the morning of January 6, he was taken up-stairs by two policemen, who were armed with guns, to the office of Chief Detective Duncan, and left there with Branagan and Duncan.   He stated that Duncan and Branagan gave him a raking over.   When asked what they said, he answered, "Well, they just asked if I knew Carl Moore, and I told them, 'No.'   And they asked me if I killed him; and they asked 101 other questions, but I never answered no more of them. I had my mind on those two fellows that brought me up there.   I never said another word to them all the time I was there."   After that the two policemen took him back to the cell.   He further testified that in the afternoon the two policemen came again, and, when told that he had said nothing to Chief Duncan and Branagan, they both pulled the hammers of their guns back and said, "You do just as we tell you to or that will be the end of you when you come back."   Thereupon· he was again taken for an interview with Duncan and Branagan.   He testified that he went up there, and they started to ask him some questions, and he would not answer them, and they brought in some paper and told him to sign his name on that.   He stated Chief Duncan said, "Here is a piece of paper, sign your name on there."   I said, "Give me that paper and let me read it first." He said, "I won't let you read it, I told you to sign your name on there, and you do it."   Defendant thereupon signed his name in three or four places.   Defendant claimed that he did not know what it contained.   The paper re-

ferred to was the signed confession to which reference has been made. With respect to each of the other confessions referred to, defendant denied having made them.

It is earnestly insisted that it was error to permit the written confession, as well as the other confessions, to be received in evidence. The rule is well established that a confession freely and voluntarily made by the accused, not induced by threats or promises, is competent evidence on the trial. *Fouse v. State,* 83 Neb. 258. Under the evidence, whether the confessions were freely and voluntarily made was a question for the jury to determine.

Upon the phase of the case relating to the confession and the plea of guilty made by the defendant at the preliminary hearing the court instructed the jury that, if they were satisfied by the evidence, beyond a reasonable doubt, that such confessions, or any of them, or the plea of guilty, were freely and voluntarily made on the part of defendant, and were not induced by any promise, inducement, threat, persuasion, or demand on the part of any one, then they should consider any such confession as evidence in the case and give the same such credence or weight as they deemed it entitled to. On the other hand, they should wholly disregard and not consider any confession, admission, or plea of guilty, offered in evidence in this case, if they were not satisfied by the evidence, beyond a reasonable doubt, that the defendant was at the time of making the same mentally capable of doing so, and that it was done voluntarily and freely by the defendant, and not induced by any hope or fear on his part, or by the promise, inducement, persuasion, demand, or threat of any one. This instruction was, perhaps, more favorable to the accused than he was entitled to; in this, that the jury were told not to consider the confession unless they believed from the evidence, beyond a reasonable doubt, that the confessions were freely and voluntarily made. This instruction carefully guarded the rights of the defendant and left the jury to determine the disputed question of whether the confessions were freely and voluntarily made. This practice is approved in *Heddendorf v. State,* 85 Neb. 747.

The correctness of instruction No. 14 given by the court, defining "reasonable doubt," is assailed by the defendant. This instruction is substantially the same as the one given in *McIntosh v. State*, 105 Neb. 328, which was approved by this court. Objections are also made to several other instructions given by the court. It seems unnecessary to consider each of the objections separately. Suffice it to say that we have examined them and find that there was no prejudicial error in giving them.

Defendant also urges that the court erred in permitting the jury to separate during the trial, before the case was submitted, without admonishing them as provided by law. Section 10150, Comp. St. 1922, among other things, provides: "If the jury are permitted to separate during the trial, they shall be admonished by the court that it is their duty not to converse with, or suffer themselves to be addressed by any other person on the subject of the trial," etc. It is argued that on several occasions when an adjournment was taken the admonition was not given. The record, however, does not sustain this contention. It is true that in some instances the bill of exceptions fails to disclose such admonition, but a reference to the transcript shows that the admonition was given.

It is also urged that the court erred in permitting the witnesses Harvey and Mabel Moore to testify on rebuttal, because they were present during the trial in violation of an order of the court excluding witnesses. These witnesses were called in rebuttal, and at the time the order was made there was nothing to indicate that the order in any way referred to them. Under such circumstances it was within the discretion of the court to permit them to testify. *Fouse v. State*, 83 Neb. 258.

It is further contended by the defendant that the court erred in failing to grant a new trial because of the alleged misconduct of juror Kerr. In support of the motion for a new trial, a witness was called who testified that, a few days before the trial, he heard juror Kerr state, in reference to the defendant, that "he should have six feet over him,"

and if he was left on the jury he would see that he got it. The record shows that on the day the motion for a new trial was heard this juror received an injury and was not able to be present. However, his *voir dire* examination is in the record and discloses that he had never formed or expressed any opinion about the case and otherwise qualified as a juror. Under the circumstances we are of the opinion that the court did not err in overruling the motion for a new trial.

Other errors are assigned which we have examined but regard them as without merit. Defendant has had a fair trial. His legal rights have been carefully guarded. If the testimony on behalf of the state is to be believed, the crime was premeditated and deliberate murder. No reason has been advanced why we should disturb the judgment.

Under the law it is the province of the jury in cases of this character to determine whether the penalty shall be life imprisonment or death. No prejudicial error appearing in the record, the judgment of the district court is affirmed, and Friday, the ninth day of July, 1926, between the hours of 6 a. m. and 6 p. m. of said date, is fixed for carrying into effect the sentence of the district court.

AFFIRMED.